FREDERICKA HOMBERG WICKER, Judge.
|2Pefendant Devin K. Bonilla appeals his conviction for second degree murder in violation of La. R.S. 14:30.1, alleging that the evidence presented at trial was insufficient to support his conviction for second degree murder and assigning error to the trial court’s denial of defendant’s motion to amend jury charges, the court’s denial of defendant’s motion to suppress photographic lineup identifications, the court’s denial of defendant’s motion to suppress evidence seized pursuant to a search warrant, and the court’s denial of defendant’s motion to reconsider sentence. For the following reasons, we affirm defendant’s conviction' and sentence.

Procedural History

On April 10, 2014, a Grand Jury returned a true bill of indictment charging defendant with second degree murder. At his April 14, 2014 arraignment, defendant pled not guilty to the charged offense. On July 9, 2014, defendant filed |aa motion to suppress, a photographic lineup and a motion to suppress evidence seized from defendant’s residence pursuant to a search warrant. On August 7, 2014, after a hearing on defendant’s motions, the trial court denied both motions. On December 10, 2014, defendant amended his plea of not guilty to a plea of not guilty and not guilty by reason of insanity. On January 7, 2015, a competency hearing took place, wherein the trial court found defendant competent to proceed to trial based on defendant’s stipulation to his competency and the recommendations-of Dr. Rafael Salcedo and Dr. Richard Richoux that defendant was competent to-proceed to trial.
*1249 On April 6, 2015, the trial commenced before a twelve-person jury. On April 8, 2015, the last day of the trial, defendant filed a motion to amend the jury charges, urging the trial court to remove a proposed jury instruction permitting the jury to return a guilty verdict upon the concurrence of ten of the twelve jurors, which the trial court denied. After deliberations, the jury returned a verdict finding defendant guilty of second degree murder. On defendant’s motion, the trial court polled the jury and found that eleven of the twelve jurors concurred that defendant was guilty of second degree murder. At the sentencing hearing on April 16, 2015, the trial court sentenced defendant to life imprisonment without benefit of probation, parole, or suspension of sentence. On the same day, defendant filed a motion for appeal, which the trial court granted on April 20, 2015. On May 8, 2015, defendant filed a pro se “Motion to Reconsider Sentence Pursuant to 881.1,” which the trial court denied on May 20, 2015.

Facts

At approximately 2:30 a.m. on January 18, 2014, Bowie Richard was killed by a lethal gunshot wound to the head in the parking lot of The Edge Sports Bar in Harvey, Louisiana (hereinafter, “The Edge”). At the time of the shooting, multiple | ¿witnesses were nearby and were able to provide investigating officers with detailed accounts of the events that occurred prior to, and after, the victim’s death. While the testimony of the witnesses differs in minor respects, the relevant facts, consistent among all accounts, are as follows:
The victim was a local rap artist who performed at another local bar called Honey’s on the evening of January 17, 2014. After the performance, the victim and several friends met at The Edge, where they had drinks and socialized. Already present at The Edge were defendant, his friend Tony Nguyen, and his cousin, Rier-on Flores. While at The Edge, defendant and his two companions played pool and socialized with other patrons.
At some point in the night, defendant sat at the bar next to Alexandra Folse, who testified that she had met defendant through a mutual friend approximately eight years earlier and had been friends with the victim since the two had attended high school together. While sitting next to Ms. Folse, another witness, Kristopher Wooten, who was friends with Ms. Folse and the victim, purchased drinks for himself, Ms. Folse, and defendant. Ms. Folse testified that during her conversation with defendant, he was speaking to her in an aggressive manner about her child’s father and defendant’s child’s mother, with whom Ms. Folse was friends. At some point during their conversation, the victim arrived at The Edge, approached the bar from behind where Ms. Folse and defendant were seated, and spoke to his friends seated nearby. At this point, witnesses who had been seated at the bar testified that a verbal altercation began between defendant and the victim, though the cause of the argument was unclear.
Witnesses- testified that defendant and the victim engaged in their verbal altercation until defendant walked to the other side of the barroom to speak with his associates, Mr. Flores and Mr. Nguyen. According to Ms.- Folse, the victim |Kalso approached Mr. Flores to talk to him before returning to the bar area. Mr. Flores testified that he had known thé victim since they had attended high school together., Mr. Flores left the barroom at some point thereafter and went to Mr. Nguyen’s car to smoke marijuana. The confrontation which had begun between defendant and the victim then continued between Mr. Nguyen, the victim, and the *1250 victim’s Mends without defendant’s participation. As the confrontation escalated, the participants exited the barroom and continued the altercation in the parking lot in front of The Edge.
In the parking lot, Mr. Nguyen ran to the driver’s side of his vehicle followed closely by the victim and his friends. Mr. Flores, who was seated in the passenger side of the car, testified that the victim and his friends continued the confrontation, in the parking lot as they approached the vehicle, where Mr. Nguyen was standing. Meanwhile, defendant ran from the barroom behind the. participants of the argument toward his truck, which was parked several parking spots away in front of a neighboring Papa John’s Pizza Restaurant.
The argument continued to escalate until Mr. Nguyen retrieved a pistol from his vehicle and displayed it to the victim in a threatening manner. At this point, witnesses testified that the victim began to retreat. However, as the victim backed away from Mr. Nguyen’s car and his attention was directed toward Mr. Nguyen’s threatening pistol, an individual rapidly approached the victim from the- opposite side and fired a. gun at close range in the direction of the victim’s head.
The shooter immediately fled the scene in a, Ford pickup truck, and Mr. Nguyen and Mr. Flores followed suit in Mr. Nguyen’s car. Bradley Smith used his phone to take pictures of these vehicles as they exited the parking lot , and later provided investigating police officers with the pictures. Other witnesses present at the scene called 9-1-1 moments after the gunshot.
| (¡Officers responding to the scene found the victim lying lifeless on the ground in the parking lot with blood coming from his mouth and nose. • A deputy coroner later testified at trial that the gunshot wound was the exclusive cause of the victim’s death and that he could not have lived more than a few seconds after being shot.
Officers discovered a spent bullet casing on the’ground near the victim’s body and a live round on the ground near a parking spot in front of the Papa John’s Pizza Restaurant. The spent bullet casing and the live round would later be identified as ammunition for a nine millimeter pistol. Investigating, officers immediately taped off the crime scene, separated witnesses to the crime from the crowd that had gathered in front of The Edge, and placed the witnesses in separate patrol cars in order to preserve their independent recollections of the events.
Eyewitnesses interviewed at the scene of the crime identified defendant as the shooter, and at least one witness was able to provide officers with defendant’s address. .Upon receiving this information, investigating officers conducted a criminal history search and found that defendant’s last known address was the same as that which was provided by the witness. Investigators also used the witnesses’ identifications of defendant to develop "a photographic lineup. Officers obtained defendant’s driver’s license photograph and used a computer database to develop a photographic lineup consisting of defendant’s photograph and the photographs of five other individuals of similar weight, height, race, gender, hairstyle, complexion, and facial features. On the same day as the shooting, officers showed the photographic lineup to several witnesses. Alexandra Folse, Juliana Pagan, Brett Dufrene, and Justin Vance all made positive identifications of defendant as the individual who shot the victim. Two witnesses, Victoria Frickey and Bradley Smith, could not make positive identifications, of defendant. Ms. |7Frickey and Mr. Smith testified at trial that they were unable to identify defen *1251 dant in the photographic lineup because his hairstyle and facial hair were different on the night • of the murder than they' appeared in the photograph used for the lineup.
Using information obtained from eyewitnesses, Detective Travis Eserman applied for a search warrant of defendant’s last known residential address. Detective Es-erman attached an affidavit to the search warrant application, dated January 18, 2015, which set forth the' relevant facts discovered up to that point in the investigation, including the witnesses’ identifications of defendant as the shooter and their descriptions of his clothing, the bullet casing and live bullet recovered at the scene of the crime, and the last known address of defendant. Detective Eserman presented the search warrant application to a criminal commissioner in the Twenty-Fourth Judicial District Court, who signed the warrant. The search warrant provided the municipal address and a physical description of the residence and authorized police officers to search the residence for weapons, ammunition, biological evidence, and forensic evidence. Upon executing the search warrant, officers seized, among other things, several firearms, an empty box for a Glock nine millimeter pistol, and a red shirt consistent, with .witnesses’ descriptions of defendant’s clothing on the night of the shooting.
At trial, Jene Rauch, a Jefferson Parish Sheriff’s Office firearms examiner, testified that because no Glock weapons were recovered by police officers and submitted for testing, she could not say with one hundred percent -accuracy that the spent nine millimeter bullet casing recovered by police officers near.the victim’s body was fired 'from a Glock pistol. Nevertheless, Ms. Rauch testified that the spent casing was consistent with being fired .from a Glock pistol, and that the live round recovered, from. a parking spot in- front of the Papa' John’s Pizza Restaurant was also of the type that could be fired from a nine millimeter pistol. The State |salso called James Hart, who testified that..he had traded a Glock nine millimeter pistol in exchange for a rifle and $400.00 from defendant prior to the date of the- shooting. Mr. Hart testified that he had sold the Glock to defendant in its, original box, along with. .everything that would, have been included in a retail purchase of a new gun. Mr. Hart identified the Glock box seized from defendant’s home-as the same, one he sold, to defendant based on the serial number .that appeared on the box which matched' the serial number he recorded on a bill of sale created in connection with the transaction.
During his case in chief, defendant presented the testimony of John Muggivan, a social worker who opined that defendant suffered from Post-Traumatic Stress Disorder (“PTSD”) as a result of his military service in Iraq. On rebuttal,-.. the- State presented the testimony of Dr. Rafael Sal-cedo, a clinical psychologist, Dr. Richard Richoux, a forensic psychiatrist, and Dr. Michael Blue, also a forensic psychiatrist. All three of the State’s expert witnesses testified that, even assuming defendant suffered from PTSD, there was no evidence that defendant was unable to distinguish right from wrong on the night in question.

Discussion and Analysis

-Though defendant alleges the insufficiency of the evidence to support his second degree murder conviction in his fourth assignment of error'[1], when the is *1252 sues on appeal relate to both the sufficiency of the evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence by considering the entirety of the evidence before addressing the allegations of trial error. State v. Hearold, 603 So.2d 731, 734 (La.1992). Accordingly, we' first Uaddress the sufficiency of the evidence before addressing defendant’s remaining assignments of error.
Defendant argues that the evidence was insufficient to support k jury’s finding that he was guilty of second degree murder. Defendant argues that the preponderance' of the evidence shows that he committed the offense in sudden passion or heat of blood which would have deprived an average person of his self-control and cool reflection, requiring the jury to find defendant guilty of the lesser offense of manslaughter, rather than second degree murder. In the alternative, defendant argues that at trial he proved by a preponderance of the evidence that he was not guilty by reason of insanity.
In his pro se' brief, defendant argues that the evidence was insufficient to support a jury’s finding that he was guilty of second degree murder. Defendant argues that the witnesses’ statements and versions of the events of the night were completely different, that the majority of witnesses could not identify him in a lineup, that the witnesses were unreliable, and that the circumstantial evidence presented by the State failed to exclude every reasonable hypothesis of innocence.
In reviewing the sufficiency of the evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or 'a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979); State v. Neal, 00-674 (La.6/29/01), 796 So.2d 649, 657, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002). Evidence may be direct or circumstantial. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact can be inferred according to reason and common experience. State v. Williams, 05-59 (La.App. 5 Cir. 5/31/05), 904 So.2d 830, 833. All evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. State v. Wooten, 99-181 (La.App. 5 Cir. 6/1/99), 738 So.2d 672, 675, writ denied, 99-2057 (La.1/14/00), 753 So.2d 208.
An appellate court’s primary function is not to re-determine the defendant’s guilt or innocence in accordance with its appreciation of the facts and credibility of the witnesses. Rather, our function is to review the evidence in the light most favorable to the prosecution and determine whether there is sufficient evidence to support the jury’s conclusion. State v. Preston, 15-306 (La.App. 5 Cir. 10/28/15), 178 So.3d 207, 214 (citing State v. Banford, 94-883 (La.App. 5 Cir. 3/15/95), 653 So.2d 671, 677). The credibility of witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any *1253 witness; the credibility of the witnesses will not be reweighed on appeal. Id.; State v. Rowan, 97-21 (La.App. 5 Cir; 4/29/97), 694 So.2d 1052, 1056.
In order to prove second degree murder, the State must show the killing of a human being, and that defendant had the specific intent to kill or inflict great bodily harm. La. R.S. 14:30.1. Specific criminal intent is “that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” La. R.S. 14:10(1). Specific intent may be inferred from the circumstances and actions of the defendant, and the intent to kill or to inflict great bodily harm may be inferred from the extent and severity of the victim’s injuries. State v. Keating, 00-51 (La.App. 5 Cir. 10/18/00), 772 So.2d 740, 743, writ denied, 00-3150 (La.10/12/01), 799 So.2d 494. A defendant’s act of aiming a lethal weapon and discharging it in the direction of his victim supports a finding by the trier of fact that the defendant |n acted with specific intent to kill. State v. Hidalgo, 95-319 (La.App. 5 Cir. 1/17/96), 668 So.2d 1188, 1197.
In order for defendant to have been convicted of manslaughter, the evidence would have to have shown that the homicide, which would have been second degree murder, was committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. La. R.S. 14:31(A)(1); State v. Hicks, 01-1064 (La.App. 5 Cir. 4/10/02), 817 So.2d 192, 197, writ denied, 02-1580 (La.5/30/03), 845 So.2d 1068. Sudden passion and heat of blood distinguish manslaughter from murder, but they are not elements of the offense. Instead, they are mitigatory factors which may reduce the grade of the offense. State v. Patterson, 10-415 (La.App. 5 Cir. 1/11/11), 63 So.3d 140, 150, writ denied, 11-338 (La.6/17/11), 63 So.3d 1037. The defendant has the burden of proving-those mitigating circumstances by a preponderance of the evidence. Id.
Whether sufficient provocation existed for the reduction of the offense to manslaughter is a question to be determined by the jury under .the standard of the average or ordinary person, one with ordinary self-control. Patterson, 63 So.3d at'150. An ai-gument aione does not constitute sufficient. provocation to reduce murder to manslaughter. State v. Johnson, 06-623 (La.App. 3 Cir. 11/2/06), 941 So.2d 696, 702, writ denied, 06-3024 (La.9/14/07), 963 So.2d 995,
In the present case, the evidence showed that defendant and the victim engaged in a verbal altercation while inside the bar. There is disputed testimony in the record as to whether defendant or the victim initiated the altercation, but no witnesses testified as to any physical threat to defendant, nor does defendant-allege that the victim physically threatened him. After the argument between defendant 11gand the victim had apparently subsided, Tony Nguyen reignited the conflict and exited the bar with several people following him, including the victim.
Witness testimony established that the victim and Mr. Nguyen eontihuéd their argument in the parking lot outside of the bar in the proximity of Mr.' Nguyen’s car without deferidant’s participation. Several witnesses testified that during this argument, Mr. Nguyen retrieved a gun from his car and displayed it to the victim in a threatening manner. There is no evidence in the record' that the victim or any of his friends were armed, and witnesses testified that the victim had begun: to retreat from Mr.-Nguyen upon seeing his gun, at which. point' he was shot by a lethal gun *1254 shot wound to the head from not more than one to two feet away, according to the testimony of deputy coroner Marianna Es-erman.
Four witnesses identified defendant as the shooter on the same night of the murder, all of whom testified that they were standing in close proximity to the victim and defendant at the time of the shooting and had known both the victim and defendant for several years prior to January 18, 2014. Contrary to defendant’s claim that all the witnesses who identified him were friends of the victim, Tony Nguyen, defendant’s friend and a party to the argument with the victim, gave a statement‘to police during their investigation wherein he stated that during the" argument, he saw defendant run, to the victim and shoot him. The transcribed statement was introduced at .trial,, and published to the jury after Mr. Nguyen claimed he was unable to recall whether he saw defendant shoot the victim. .
Officers responding to the scene of the murder recovered a spent bullet casing near the victim’s body, which was consistent with being fired from a nine millimeter firearm, and a live round recovered from the ground next to a parking spot near a Papa John’s Pizza Restaurant nearby, which could have been fired from a nine millimeter handgun. Detective Jean Lincoln, the lead detective responding 11sto the scene of the crime, testified that witnesses reported that defendant had retrieved a gun from his truck, “racked it”,[2] and then went to the scene and shot the victim before returning to his truck and fleeing from the parking lot. Detective Lincoln testified that the location from which the live ammunition was recovered was consistent with the location where witnesses reported' defendant’s truck had been parked. Investigating officers also obtained surveillance video footage from the Papa John’s Pizza Restaurant located next to The Edge Bar. In this footage, which was introduced at trial and published to. the jury, defendant is visible at the approximate time of the murder quickly approaching his parked truck, opening the driver’s side door, running toward the location of the bar, and quickly running back to his truck seconds later.
Upon executing the search warrant for defendant’s home, officers recovered several firearms in defendant’s room and an empty box from a Glock brand nine millimeter pistol. This firearm was never recovered, but James Hart testified at trial that prior to the date of the murder, he traded a nine millimeter Glock pistol, along with the box from the gun manufacturer, to defendant in exchange for a rifle. Mr. Hart identified the empty Glock pistol box as the same one he gave to defendant and identified defendant as the person with whom he transacted prior to the night of the murder. Officers also recovered from defendant’s residence a red shirt, which was consistent'with witnesses’ descriptions of what the shooter was wearing on the night of the murder.
While there are minor discrepancies among the numerous witnesses called by the State as to the exact sequence of events that occurred on the night of the murder, the minor discrepancies do not negate the overall consistency among the witnesses as to the facts sufficient to support a finding that defendant was guilty of | 14second degree murder. There is no dispute that the victim was killed by a lethal gunshot wound to the head. The numerous reliable witness identifications of defendant as the shooter and their accounts *1255 of the events, which are corroborated by surveillance footage and evidence. seized from defendant’s residence, support a finding beyond a reasonable doubt that defendant was 'the individual who aimed a gun and discharged it at point blank range in the direction of the victim’s head. Consequently, the evidence is sufficient to support a finding that defendant acted with specific intent to kill the victim. See Hi-dalgo, 688 So.2d at 1197, Accordingly, we find no merit in defendant’s arguments regarding inconsistent and unreliable' witnesses, or in his argument that the State failed to exclude every reasonable hypothesis of innocence.
Defendant’s argument that he was reacting to stimuli in a violent environment is similarly unpersuasive. The evidence presented at trial shows no evidence that the victim threatened defendant with physical threats sufficient to deprive an average person of self-control and cool reflection. Moreover, the testimony of multiple witnesses, as well as video surveillance evidence from both the inside of the bar and the neighboring pizza restaurant, és-tablished that, at the time defendant shot the victim, the primary parties to the quarrel were the victim and Tony Nguyen, and that the victim was unarmed during the argument while Mr. Nguyen brandished a lethal weapon.
Alternatively, defendant argues that the evidence was insufficient to support the jury’s guilty verdict because at trial he proved by a preponderance of evidence that he was insane at the time of the offense. Specifically, defendant argues that testimony presented at trial established that he suffers from PTSD, which prevents him from distinguishing between right and wrong in stressful situations. Defendant argues that ’the incident which occurred on January 18, 2014 was a | ^situation in which it was more likely than not that he was unable to tell right from wrong.
In reviewing a claim for insufficiency of evidence in an action where the affirmative defense of insanity is raised, the appellate court, applying the standard set forth in Jackson v. Virginia,, supra, must determine whether under the facts and circumstances of the case, any rational fact-finder, viewing the 'evidence most favorably to thé prosecution, could conclude, beyond a reasonable doubt, that the defendant failed to prove by a preponderance of the evidence that he was insane at the time of the offense. State v. Williams, 07-1407 (La.10/20/09), 22 So.3d 867, 876, cert. denied, 560 U.S. 905, 130 S.Ct. 3278, 176 L.Ed.2d 1184 (2010); State v. Williams, 10-1010 (La.App. 5 Cir. 9/27/11), 76 So.3d 90, 96.
In. Louisiana, a defendant is presumed to be sane. La. R.S. 15:432; Williams, 76 So.3d at 96. To rebut the presumption of sanity and avoid criminal responsibility, the defendant has the burden under La.C.Cr.P. art. 652 of proving the affirmative defense of insanity by a preponderance of the evidence. Criminal responsibility is not negated by the mere existence of a mental disease or defect. To be exempted from criminal responsibility, the defendant must show he suffered a mental disease or defect which prevented him from distinguishing between right and wrong, at the time he committed the conduct in question. La, R.S.. 14:14; Williams, 76 So.3d at 96.
Sanity is a factual matter for the trier of fact, to-be determined from all of-the evidence, both lay and expert, along with circumstances surrounding the events and testimony relating to the defendant’s behavior before, during, ■ and after the crime. A determination of the weight of the evidence is a- question of fact that rests *1256 solely with the trier of fact; who may accept or reject, in whole or in part, the testimony of any witness, and if rational triers of fact could disagree as to the | ^interpretation of the evidence, the rational trier’s view of all of the evidence most favorable to the prosecution must be adopted. Williams, 22 So.3d at 875-876.
At trial, the defense presented the testimony of John Muggivan, qualified as an expert witness in the field of social work. Mr. Muggivan testified that he had reviewed the reports of other experts who examined defendant and concluded that defendant suffered from PTSD. However, Mr. Muggivan also acknowledged that the symptoms of PTSD vary in severity,, and while defendant’s condition could cause him to panic more easily than the average person, he would not testify that defendant’s PTSD caused him to be unable to distinguish between right and wrong.
On rebuttal, the State called three expert witnesses, each of whom held doctoral degrees in the fields of psychology or psychiatry. All three experts testified consistently that there was no indication that defendant was unable to distinguish right from wrong at the time'of the offense. Moreover, two of the experts, ■ including Dr. Michael Blue, an expert who was previously retained by the defense for an independent examination of defendant, testified that defendant’s flight from the scene of the crime, which indicated defendant’s consciousness of guilt, was -inconsistent with a finding that defendant was insane at the time of the offense.
After.hearing the testimony of the witnesses, the jury obviously rejected defendant’s argument and believed that defendant was capable of distinguishing between right and wrong at the time of the offense, despite the alleged presence of a mental illness. The credibility of witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; the credibility of the witnesses will not be reweighed on appeal. State v. Rowan, 97-21 (La.App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056.
| ^Considering the totality of the evidence, viewed most favorably to the prosecution, we find that a rational trier of fact could have concluded, beyond a reasonable doubt, that defendant failed to prove, by a preponderance of the evidence, his insanity at the time of the offense.
Accordingly, the arguments raised in this assignment of error lack merit.
In his first assignment of error, defendant argues that the trial court erred in denying his motion to amend the jury charges. Defendant argues that the instructions given to the jury at his trial were unconstitutional because the jury was charged to return a guilty verdict by a concurrence of ten of the twelve jurors. Defendant further argues that non-unanimous jury verdicts have an insidious racial component for which there is no constitutional justification. Accordingly, defendant contends that his conviction must be set aside and his case remanded for a new trial in which only a unanimous verdict will be accepted.
The record reflects that defendant’s motion to amend the jury charges was heard before testimony began on the last day of defendant’s trial. After denying defendant’s motion, the jury was charged that a guilty verdict required the concurrence of ten of the twelve jurors. After the jury returned its guilty verdict, the record reflects that defendant failed to lodge any objection to the verdict.
La.C.Cr.P. art. 802 mandates the trial’ court to charge the jury “as to the law applicable to the case.” La.C.Cr.P. art. 782 provides: “Cases in which punishment *1257 is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict/’
The punishment for the offense charged against defendant in this case was necessarily confinement at hard labor. Therefore, La. C.Cr.P. art. 802 mandated that the trial court instruct the jury that the concurrence of ten of the twelve jurors 118was necessary to return a guilty verdict. Accordingly, we find no error in the trial court’s denial of' defendant’s motion to amend the jury charges.
Turning to defendant’s argument that his felony conviction by a non-unanimous jury is unconstitutional, we find that defendant failed to lodge a contemporaneous objection to the verdict, precluding appellate review of the alleged error, under La.C.Cr.P. art. 841[3]. Nevertheless, because defendant filed a motion to amend the jury charges in the trial court, wherein he argued that the non-unanimous verdict was unconstitutional, and La.C.Cr.P. art. 841 does not require a contemporaneous objection to a "Court’s ruling on a written motion to preserve the alleged error for review, wé address the merits of the ás-signment.
In Apodaca v. Oregon, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972), the United States Supreme Court, in a plurality decision, determined that the United States Constitution did not mandate unanimous jury verdicts in state court felony criminal trials.
Defendant argues that recent Supreme Court decisions have reexamined the history and application of the constitutional guarantee of the right to trial by jury and impugn the plurality’s holding in Apodaca, supra. In support of his argument, defendant relies on a series of post-Apodaca United States Supreme Court decisions which establish an adult criminal defendant’s general right, under the Sixth and Fourteenth Amendments, to a jury finding beyond a reasonable doubt of any fact used to increase the sentence for a felony conviction beyond the maximum term permitted by conviction of the charged offense alone. See, e.g., United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005); Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004); Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Edüd 556 (2002); Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).
This issue has been addressed by the Louisiana Supreme Court, this Court, and other appellate courts in this state, and all have rejected the argument. See, State v. Bertrand, 08-2215 (La.3/17/09), 6 So.3d 738, 743; State v. Brooks, 12-226 (La.App. 5 Cir. 10/30/12), 103 So.3d 608, 613-14, writ denied, 12-2478 (La.4/19/13), 111 So.3d 1030; State v. Barbour, 09-1258 (La. App. 4 Cir. 3/24/10), 35 So.3d 1142, 1151, writ denied, 10-934 (La.11/19/10), 49 So.3d 396, cert. denied, 562 U.S. 1217, 131 S.Ct. 1477, 179 L.Ed.2d 302 (2011).
In Bertrand, 6 So.3d at 743, the Louisiana Supreme Court reversed a district *1258 court ruling that La.C.Cr.P. art. 782 was unconstitutional, stating:
Due to this Court’s prior determinations that Article 782 withstands constitutional scrutiny, and because we are not presumptuous enough to suppose, upon mere speculation, that the United States Supreme Court’s' still valid determination that non-unanimous 12 person jury verdicts are constitutional may someday be overturned, we find that the tidal court erred in ruling that Article 782-violated the Fifth, Sixth, and Fourteenth Amendments. With respect to that ruling, it should go without saying that a trial judge is not at liberty to ignore the controlling jurisprudence of superior courts.
In light of the foregoing jurisprudence, we find no merit in defendant’s argument that non-unanimous jury verdicts in cases such as this violate the United States or Louisiana Constitutions.
Finally, defendant argues that the use of ■non-unanimous verdicts has an insidious racial component, allowing minority viewpoints to be ignored, and is likely to chill participation by the precise groups whose exclusion the Constitution has proscribed. In Bertrand, the Louisiana Supreme Court rejected this argument, noting that a majority of the United States Supreme Court .had determined the |2nargument was without merit in Apodaca, supra. Accordingly, we follow the binding decisions established by those superior courts.
For the foregoing reasons, this assignment of error is without merit.
In his second assignment of error, defendant argues that the trial court erred in denying his motion to suppress evidence 'obtained from a photographic lineup, which defendant claims was unduly suggestive because he was the only person of Hispanic ancestry depicted in the lineup.
■' A trial court’s decision to deny a motion to suppress is afforded great weight and .will not be set aside unless the preponderance of the evidence clearly favors suppression. State v. Sam, 11-469 (La,App. 5 Cir. 2/14/12), 88 So.3d 580, 586, writ denied, 12-0631 (La.9/12/12), 98 So.3d 301, A trial court is afforded .great discretion when ruling on a motion to suppress, and its ruling will not be disturbed absent an abuse of that discretion. Id. In determining whether the, trial court’s ruling on a motion to suppress is correct, an appellate court is not limited to the evidence presented at the motion to suppress hearing but also may consider pertinent evidence presented at trial. Id,
The proper identification of a defendant is an essential element in the conviction of any crime. A defendant challenging an identification procedure has the burden to prove that the identification was suggestive and there was a substantial likelihood of misidentification as a result of the identification process. State v. McCray, 07-143 (La.App. 5 Cir. 7/30/07), 966 So.2d 616, 620, writ denied, 07-1826 (La.2/1/08), 976 So.2d 715. Strict identity of physical characteristics among the persons depicted in a photographic array is not required; however, there must be sufficient resemblance to reasonably test the identification. Id. at 620-21 (citing State v. Bright, 98-0398 (La.4/11/00), 776 So.2d 1134, 1145). This determination is made by examining articulable features of the persons | ¾, pictured such as height, weight, build, hair color, facial hair, skin color and complexion, and the shape and size of the nose, eyes, and lips. State v. Thomas, 06-654 (La.App. 5 Cir. 1/16/07), 951 So.2d 372, 377, writs denied, 07-464 (La.11/21/07), 967 So.2d 1153.
Fairness is the standard of review for identification procedures and reli *1259 ability, is the linchpin in determining the admissibility of identification testimony. Manson v. Brathwaite, 432 U.S. 98, 113-14, 97 S.Ct. 2243, 2252-53, 53 L.Ed.2d 140 (1977). The factors to be considered in assessing reliability include: (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness’s degree of attention, (3) the accuracy of the prior description of the criminal, (4) the level of certainty demonstrated at the confrontation,. and (5) the time between the crime and the confrontation. Manson, 432 U.S. at 114, 97 S.Ct. 2243. Any corrupting effect of a suggestive identification procedure is to be weighed against these factors. Id.
In this case, the lineup consisted of defendant’s photograph obtained from a police database along with five other photographs of men who appear to be of similar age as defendant and possess similar weight, skin color, hairstyle, and facial features as defendant. The lineup consisted of two rows of three photographs and defendant’s photograph was placed in the middle of the bottom row of photos. Nothing about the lineup placed undue attention on defendant, and the other men depicted in the lineup sufficiently resemble defendant to reasonably test the identification. Defendant cites no authority to support his implicit argument that all subjects of a photographic lineup must be of the same ethnicity, nor is there any evidence in the record of the ethnicity of the other subjects in this photographic lineup.
| ^Regarding the procedure employed in obtaining witness identifications in this ease, Detective Eserman testified that he simply handed the lineup to the witnesses and did not make any statements to the witnesses that would place attention on defendant or impugn the. reliability of the identifications. All witnesses who made positive identifications of defendant were shown the lineup just a few hours after the victim was murdered. The witnesses who made positive identifications of defendant testified that they had ample opportunity to see defendant prior to the offense and knew defendant prior to the night of the murder.
Upon review of the record, we' do not find that the photo lineup was suggestive, nor do we find that the 'identification procedure presented a substantial likelihood of misideritification.
Accordingly, we find this assignment of error lacks merit.
In his third assignment of error, defendant argues that'the trial court erred in denying his motion to suppress evidence seized from his home pursuant to' a search warrant. Defendant argues that the search warrant application failed to include sufficient facts to justify a reasonable belief that defendant would be found in the residence or that evidence of the crime would be discovered within the residence. Accordingly, defendant argues that the seizure of evidence pursuant to the search warrant violated the State and Federal constitutional provisions prohibiting unreasonable searches and seizures.
As a general rule, searches and seizures must be conducted pursuant to a validly executed search warrant or arrest warrant. State v. Gaubert, 14-396 (La.App. 5 Cir. 12/16/14), 167 So.3d 110, 114. A search warrant may be issued only upon probable cause established to the satisfaction of a magistrate, by the affidavit of a' credible person, particularly describing the person or place to be searched and the things to be seized. Id. Probable cause for the issuance of. a search warrant | ¡^exists when the facts and circumstances within the affiant’s knowledge and of which he has reasonably trustworthy information, are sufficient to support a reasonable *1260 belief that an offense has been committed and that evidence or contraband may be found at the place to be searched. Id. The determination of probable cause does not rest on an officer’s subjective beliefs or attitudes, but turns on a completely objective evaluation of all the circumstances known to the officer at the time of his challenged action. Id. A search warrant must establish a probable continuing nexus between the place sought to be searched and the property sought to be seized. Id.
When evidence is seized pursuant to a search warrant, the defendant bears the burden of proof at a hearing on his motion to suppress that evidence. State v. Falcon, 13-849 (La.App. 5 Cir. 3/12/14), 138 So.3d 79, 88, writ denied, 14-769 (La.11/14/14), 152 So.3d 877 (citing La. C.Cr.P. art. 703(D)). The trial court is afforded great discretion when ruling on a motion to .suppress, and its ruling will not be disturbed absent an abuse of its discretion. Id.
The task for a reviewing court is simply to ensure that under the totality of the circumstances, the magistrate had a substantial basis for concluding that probable cause existed. State v. Payne, 10-46 (La.App. 5 Cir. 1/25/11), 59 So.3d 1287, 1296, writ denied, 11-0387 (La.9/16/11), 69 So.3d 1141. Within its four corners, an affidavit must contain the facts establishing the existence of probable cause for issuing the warrant. Id. Moreover, if the magistrate finds the affidavit sufficiently detailed and reliable to show probable cause, the reviewing court should interpret the affidavit in a realistic and common sense fashion, being aware that- it is normally prepared by non-lawyer police officers in the midst and haste of a criminal investigation. Id. Within these guidelines, courts should strive to uphold warrants to encourage their use by police officers. Id.
[24In the present case, under the totality of the circumstances, we find there was a substantial basis upon which to find probable cause to issue the search warrant. At the hearing on the motion to suppress, Detective Eserman testified that he authored the affidavit of probable cause supporting his application for the search warrant. In his affidavit, Detective Eser-man averred to the following facts: On January 18, 2015, deputies were dispatched to the Edge Sports Bar in reference to a “shooting death.” At the scene of the crime, police officers found one spent nine millimeter bullet casing next to the victim’s body and one live nine millimeter bullet on the ground in a nearby parking spot. Several witnesses at the scene identified defendant as the shooter, who was wearing a red shirt and fled the scene. One of the witnesses told police that defendant’s home address was 4037 North Dells Street in Harvey, Louisiana, and the last known address listed in defendant’s criminal history report was consistent with that address. The search warrant authorized a search of 4037 North Dells Street and provided a description of the residence along with a description of the evidence police were authorized to seize pursuant to the warrant.
A completely objective evaluation of the circumstances described in the affidavit of probable cause established a probable continuing nexus between the residence and the evidence of the crime to be seized. Taken together, the witness identifications of defendant as the shooter, one witness’s report of defendant’s address, and the last known address listed in defendant’s criminal history report, were sufficient to support the reasonable belief that defendant resided at 4037 North Dells Street. Defendant’s residence was a logical place to search for evidence of his suspected criminal activity. Furthermore, *1261 this Court and the Louisiana Supreme Court have recognized that, “the police and issuing magistrate^] can reasonably assume the fruits and instrumentalities of an offense l^are probably stored in a suspect’s home.” State v. Major, 09-370 (La. App. 5 Cir. 11/24/09), 26 So.3d 289, 295 writ denied, 09-2802 (La.6/18/10), 38 So.3d 320 (citing State v. Profit, 00-1174 (La.1/29/01), 778 So.2d 1127, 1128). In light of the foregoing, we find that the trial court did not abuse its discretion by denying defendant’s motion to suppress evidence. ''
Accordingly, we find this assignment of error lacks merit:
In his fifth assignment of error, defendant argues that the trial court erred in denying his “Motion to Reconsider Sentence Pursuant to 881.1.”
Appellate review of sentences for exces-siveness is a two-pronged inquiry. State v. Lobato, 603 So.2d 739, 751 (La.1992). First, the record must show that the sentencing court complied with La.C.Cr.P. art. 894.1. Id. If this prong is met, a constitutional inquiry as to the excessiveness of the sentence follows. Id.
However, the failure to state specific grounds upon which a motion to reconsider sentence is based limits the defendant to a review of the sentence for unconstitutional excessiveness only. State v. Hill, 12-495 (La.App. 5 Cir. 12/18/12), 106 So.3d 1209, 1212. Here, the record shows that in his written’motion to reconsider sentence, defendant simply stated that his sentence to life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence is excessive and unconstitutional because it “makes no measurable contribution to acceptance [sic] goals of punishment and hence is nothing more than a purposeless and needless imposition of pain and suffering; or ... is grossly out of proportion to the severity of -the crime.” Therefore, defendant has not preserved the issue of the trial judge’s failure to comply with Article 894.1 for appeal. See State v. Brenckle, 14-883 (La.App. 5 Cir. 5/14/15), 170 So.3d 1141, 1155. As such, defendant is entitled to a review of his sentence for unconstitutional excessiveness only.
Whether' a sentence is unconstitutionally excessive, and therefore invalid, is governed by both the Eighth Amendment to the United States Constitution and Articled, § 20 of the Louisiana Constitution. A ,sentence is considered excessive if it is grossly disproportionate to the-offense or imposes needless and purposeless pain and suffering. State v. Nguyen, 06-969 (La.App. 5 Cir. 4/24/07), 958 So.2d 61, 64, writ denied, 07-1161 (La.12/7/07), 969 So.2d 628. A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done' to society, it shocks the sense of justice. State v. Lawson, 04-334 (La.App. 5 Cir. 9/28/04), 885 So.2d 618, 622.
When imposing sentences, a trial judge has broad discretion in imposing a sentence within statutory limits, and a reviewing court may not set aside a sentence in absence of manifest, abuse of discretion. State v. Williams, 03-3514 (La.12/13/04), 893 So.2d 7, 16-17. On appeal, the issue is.not.whether a different sentence might have been more appropriate, but rather, whether the trial court abused its discretion. Williams, 893 So.2d at 17; see also State v. Dorsey, 07-67 (La.App. 5 Cir. 5/29/07), 960 So.2d 1127, 1130, writ denied, 08-1649 (La.4/17/09), 6 So.3d 786.
First; we note that defendant’s life sentence is mandatory under La. R.S. 14:30.1(B). It is presumed that a mandatory minimum sentence is constitutional. *1262 State v. Cammatte, 12-55 (La.App. 5 Cir. 9/11/12), 101 So.3d 978, 985, writs denied, 12-1370 (La.10/26/12), 99 So.3d 644 and 12-2247 (La.4/5/13), 110 So.3d 1075. Nevertheless, defendant’s- mandatory minimum sentence may still be reviewed for unconstitutional excessiveness. Id. To rebut the presumption of constitutionality, the defendant must show that: “[he] is exceptional, which in this |i>7context means that because of unusual circumstances this defendant is a victim of. the legislature’s failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense and the circumstances.” Id.
Upon review of the record, we find that defendant has failed to offer any evidence establishing that he is exceptional. Instead, defendant argues that his sentence is excessive because it “represents nothing more than the needless imposition of pain and suffering,” and “is grossly, out of proportion to the crime.”
As previously discussed, there -is sufficient evidence in the record to find that defendant intentionally shot an unarmed man in the head at close range and in close proximity to a large crowd of people. Furthermore, the record reflects that defendant faced no threat to his safety, and-the testimony of all medical experts at- trial established that defendant was not deprived of his ability to distinguish between right and wrong. We find that defendant has not borne the burden of proving that his sentence was excessive.
Accordingly, we find this assignment of error lacks merit.

Errors Patent

Defendant requests an errors patent review. • However, this Court- routinely, reviews the record for errors patent in accordance with La.C.Cr.P. art 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Wetland, 556 So.2d 175 (La.App. 5 Cir.1990).
Our review reveals a discrepancy between- the commitment. and the transcript with regard to the hard labor provision of defendant’s sentence. Although the commitment reflects' that defendant’s sentence was imposed at hard labor, the transcript does not reflect that the judge ordered the sentence be imposed at hard labor.
|28La.C.Cr.P. art. 879 requires a court to. impose a determinate sentence. If the applicable sentencing statute allows discretion, the failure to indicate whether the sentence is tó be served át hard labor is an impermissible indeterminate sentence. State v. Norman, 05-794 (La.App. 5 Cir. 3/14/06), 926 So.2d 657, 661, writ denied, 06-1366 (La.1/12/07), 948 So.2d 145. Defendant was sentenced pursuant to La. R.S. 14:30.1, which mandates that his sentence be served at hard labor. As such, the trial court’s failure to state that the sentence was imposed at hard labor is harmless error and no corrective action is required. See Id.; State v. Dennis, 12-818 (La.App. 5 Cir. 5/16/13), 118 So.3d 1166, 1174, writ denied, 13-1384 (La.12/6/13), 129 So.3d 530.

Conclusion

Upon review of the l-ecord, we find no merit in defendant’s assignments of error. Accordingly, we affirm his conviction and sentence.

AFFIRMED

. Defendant has filed both a counseled brief and a pro se brief on his behalf. Defendant’s pro se brief raises ¡three of the four assignments of error raised by his counseled brief. *1252 Defendant’s pro se brief repeats the same arguments as those raised within his counseled brief as to all assignments of error except as to his claim that the evidence was insufficient to justify the verdict. For the sake of brevity and readability, all references throughout this opinion to defendant’s assignments of error refer to defendant’s counseled brief, unless otherwise noted.

. Detective Lincoln explained that if the gun’s •“chamber has a bullet in it, when you rack [the gun’s slide] back, it will eject [the bullet].'”

. We also find that the record is devoid of any indication - that the attorney general was served with a copy of the instant appeal alleging that the non-unanimous guilty verdict, authorized by La.C.Cr.P. art. 782(A), is unconstitutional. While the attorney general is not a necessary party that must be joined, he must be served in actions seeking a declaration of unconstitutionality of a statute. La. C.C.P. art. 1880; State v. Veal, 11-44 (La.App. 5 Cir. 12/28/11), 83 So.3d 211, 214-15 (citing Vallo v. Gayle Oil Co., Inc., 94-1238 (La. 11/30/94), 646 So.2d 859, 864). Nevertheless, because defendant's motion to amend jury charges attacked the jury instructions, rather than La.C.Cr.P. art. 782, we will address the merits of this assignment.